## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JASON LEOPOLD *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 1:21-cv-014 (TJK) |
| GENERAL SERVICES ADMINISTRATION, | |
| *Defendant.* | |

### DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

Defendant, by and through its undersigned counsel, hereby moves this Court for summary judgment pursuant to Fed. R. Civ. P. 56(a). For the reasons described in the accompanying Memorandum of Points and Authorities, the motion should be granted.

Dated: December 1, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

/s/ *Taisa M. Goodnature*
Taisa M. Goodnature
N.Y. Bar No. 5859137
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone: (202) 514-3786
Email: Taisa.M.Goodnature@usdoj.gov

*Counsel for Defendant*

## TABLE OF CONTENTS

BACKGROUND.................................................................................................2

I.      GSA's role in possible presidential transitions....................................................2

II.     The relevant FOIA request and procedural background.......................................4

STANDARD OF REVIEW...............................................................................6

ARGUMENT ....................................................................................................7

I.      GSA properly withheld documents pursuant to FOIA Exemption 5.....................7

        A.      GSA properly withheld deliberative email communications under
                the deliberative process privilege and Exemption 5...............................11

        B.      GSA properly withheld deliberative draft policy documents
                pursuant to the deliberative process privilege and Exemption 5.............15

        C.      The draft document that GSA disclosed to a member of the Biden-
                Harris Transition Team is protected under the deliberative process
                privilege.............................................................................................19

II.     GSA has complied with the FOIA Improvement Act's requirements that it:
        segregate and disclose non-privileged information and demonstrate that
        foreseeable harm will result from disclosure of any withheld documents. ..........23

        A.      GSA segregated and disclosed all non-privileged material within
                the requested documents.......................................................................24

        B.      GSA has demonstrated that it would suffer foreseeable harm if
                ordered to disclose any of the withheld materials...................................26

CONCLUSION ................................................................................................29

## TABLE OF AUTHORITIES

## <u>Cases</u>

*100Reporters v. U.S. Dep't of State*,
  No. CV 19-1753 (RDM), 2022 WL 1223709 (D.D.C. Apr. 26, 2022) ......................18

*Access Reps. v. DOJ*,
  926 F.2d 1192 (D.C. Cir. 1991) ..................................................................................14

*Ancient Coin Collectors Guild v. U.S. Dep't of State*,
  641 F.3d 504 (D.C. Cir. 2011) ....................................................................................14

*Brayton v. Office of the U.S. Trade Rep.*,
  641 F.3d 521 (D.C. Cir. 2011) ......................................................................................6

*Campaign Legal Ctr. v. DOJ*,
  34 F.4th 14 (D.C. Cir. 2022).............................................................. 10, 17, 18, 19

*Coastal States Gas Corp. v. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980) ............................................................ 8, 9, 10, 19

*Ctr. for Biological Diversity v. EPA*,
  369 F. Supp. 3d 128 (D.D.C. 2019)...........................................................................10

*Ctr. for Investigative Reporting v. CBP*,
  436 F. Supp. 3d 90 (D.D.C. 2019) .............................................................................26

*Dow Jones & Co. v. DOJ*,
  917 F.2d 571 (D.C. Cir. 1990) ...................................................................................22

*Dudman Commc'ns Corp. v. Dep't of the Air Force*,
  815 F.2d 1565 (D.C. Cir. 1987) ...................................................................................9

*Elec. Priv. Info. Ctr. v. DHS*,
  892 F. Supp. 2d 28 (D.D.C. 2012) .............................................................................22

*FBI v. Abramson*,
  456 U.S. 615 (1982)......................................................................................................7

*Formaldehyde Inst. v. Dep't of Health & Human Servs.*,
  889 F.2d 1118 (D.C. Cir. 1989) ...................................................................................9

*FTC v. Grolier, Inc.*,
  462 U.S. 19 (1983)........................................................................................................7

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997).....................................................................................24

i

*James Madison Project v. DOJ,*
   208 F. Supp. 3d 265 (D.D.C. 2016) .......................................................................18

*John Doe Agency v. John Doe Corp.,*
   493 U.S. 146 (1989) ................................................................................................7

*Jordan v. DOJ,*
   591 F.2d 753 (D.C. Cir. 1978), *overruled on other grounds by Crooker v. ATF,*
   670 F.2d 1051, 1053 (D.C. Cir. 1981) .....................................................................8

*Juarez v. DOJ,*
   518 F.3d 54 (D.C. Cir. 2008) ................................................................................24

*Jud. Watch, Inc. v. DOE,*
   412 F.3d 125 (D.C. Cir. 2005) .................................................................20, 22, 23

*Jud. Watch, Inc. v. DOJ,*
   20 F.4th 49 (D.C. Cir. 2021) ............................................................................*passim*

*Jud. Watch, Inc. v. Export-Import Bank,*
   108 F. Supp. 2d 19 (D.D.C. 2000) ..........................................................................9

*Jud. Watch, Inc. v. HUD,*
   20 F. Supp. 3d 247 (D.D.C. 2014) ..........................................................................6

*Jud. Watch, Inc. v. U.S. Dep't of State,*
   557 F. Supp. 3d 52 (D.D.C. 2021) ........................................................................28

*Jud. Watch, Inc. v. U.S. Dep't of State,*
   No. CV 15-687 (JEB), 2021 WL 3363423 (D.D.C. Aug. 3, 2021) ...........................18

*Judge Rotenberg Educ. Ctr., Inc. v. FDA,*
   376 F. Supp. 3d 47 (D.D.C. 2019) ........................................................................18

*Larson v. Dep't of State,*
   565 F.3d 857 (D.C. Cir. 2009) ................................................................................6

*Leopold v. DOJ,*
   No. CV 19-2796 (JEB), 2021 WL 3128866 (D.D.C. July 23, 2021) ........................28

*Lewis v. United States Dep't of Treasury,*
   851 F. App'x 214 (D.C. Cir. 2021) ........................................................................18

*Light v. DOJ,*
   968 F. Supp. 2d 11 (D.D.C. 2013) ..........................................................................6

*Machado Amadis v. U.S. Dep't of State,*
   971 F.3d 364 (D.C. Cir. 2020) ........................................................................25, 26

*Mapother v. DOJ*,
   3 F.3d 1533 (D.C. Cir. 1993)................................................................................14

*Montrose Chem. Corp. of Cal. v. Train*,
   491 F.2d 63 (D.C. Cir. 1974)..........................................................................14, 15

*Morley v. CIA*,
   699 F. Supp. 2d 244 (D.D.C. 2010), *vacated in part on other grounds*,
   466 Fed. App'x 1 (D.C. Cir. 2012)..........................................................................8

*Nat'l Immigr. Project of Nat'l Laws. Guild v. ICE*,
   *No.* 17-CV-02448 *(APM)*, 2020 WL 5798429 (D.D.C. Sept. 29, 2020) .....................18

*NLRB v. Robbins Tire & Rubber Co.*,
   437 U.S. 214 (1978)................................................................................................7

*NLRB v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975)............................................................................................8, 9

*Petroleum Info. Corp. v. U.S. Dep't of the Interior*,
   976 F.2d 1429 (D.C. Cir. 1992)............................................................................14

*Porup v. CIA*,
   997 F.3d 1224 (D.C. Cir. 2021)............................................................................24

*Protect Democracy Project, Inc. v. DOE*,
   330 F. Supp. 3d 515 (D.D.C. 2018)................................................................22, 23

*Pub. Citizen, Inc. v. DOJ*,
   111 F.3d 168 (D.C. Cir. 1997)......................................................................22, 23

*Pub. Citizen, Inc. v. OMB*,
   598 F.3d 865 (D.C. Cir. 2010)..............................................................................14

*Pub. Citizen, Inc. v. U.S. Dep't of Educ.*,
   388 F. Supp. 3d 29 (D.D.C. 2019) .......................................................................10

*Pub. Emps. for Env't Resp. v. EPA*,
   No. 18-CV-2219 (BAH), 2021 WL 2515007 (D.D.C. June 18, 2021).................18, 19

*Reps. Comm. for Freedom of the Press v. FBI*,
   3 F.4th 350 (D.C. Cir. 2021)..........................................................................*passim*

*Reps. Comm. for Freedom of the Press v. CBP*,
   567 F. Supp. 3d 97 (D.D.C. 2021), *appeal dismissed*, No. 21-5293,
   2022 WL 801357 (D.C. Cir. Mar. 15, 2022)........................................................18

*Rosenberg v. Dep't of Def.*,
    442 F. Supp. 3d 240 (D.D.C. 2020)..........................................................................26

*Rosenberg v. U.S. Dep't of Def.*,
    342 F. Supp. 3d 62 (D.D.C. 2018) ..........................................................................26

*Russell v. Dep't of the Air Force*,
    682 F.2d 1045 (D.C. Cir. 1982) .......................................................................10, 25

*Ryan v. DOJ*,
    617 F.2d 781 (D.C. Cir. 1980) .........................................................................20, 21

*Senate of the Commonwealth of Puerto Rico on Behalf of Judiciary Comm. v. DOJ*,
    823 F.2d 574 (D.C. Cir. 1987) ................................................................................10

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) ..............................................................................24

*Taylor Energy Co. LLC v. U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt.*,
    271 F. Supp. 3d 73 (D.D.C. 2017) ..........................................................................18

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
    141 S. Ct. 777 (2021) ...................................................................................*passim*

*United States v. Weber Aircraft Corp.*,
    465 U.S. 792 (1984).................................................................................................7

*Vaughn v. Rosen*,
    523 F.2d 1136 (D.C. Cir. 1975) ................................................................................9

*Citizens for Resp. & Ethics in Washington v. DOJ* (*"CREW"*),
    45 F.4th 963 (D.C. Cir. 2022)................................................................................13

*Wolf v. CIA*,
    473 F.3d 370 (D.C. Cir. 2007) .................................................................................6

## **Statutes**

5 U.S.C. § 552 ..............................................................................................*passim*

The Presidential Transition Act of 1963 ("PTA"),
    Pub. L. No. 88-277, 78 Stat. 153 (1964).........................................................2, 3, 22

The FOIA Improvement Act of 2016,
    Pub. L. No. 114-185, 130 Stat. 538 (2016)..............................................................23

## **Rules**

Fed. R. Civ. P. 56(a) ......................................................................................1

## **Regulations**

Exec. Order No. 13,727, *Facilitation of a Presidential Transition*,
   81 Fed. Reg. 29465 (May 6, 2016)..............................................................22

## **Other Authorities**

Kenneth Culp Davis*, The Information Act: A Preliminary Analysis*,
   34 U. Chi. L. Rev. 761 (1967) ...................................................................8

Letter from Emily W. Murphy, Administrator, U.S. General Services
Administration to the Honorable Joseph R. Biden, Jr. (Nov. 23, 2020),
   https://www.gsa.gov/cdnstatic/2020-11-23_Hon_Murphy_to_Hon_Biden_0.pdf.......13

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

In this action filed under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, Plaintiffs Jason Leopold and Buzzfeed, Inc., seek records relating to the General Service Administration's ("GSA") ascertainment of Joseph R. Biden, Jr., as the President-elect following the 2020 presidential election.

Plaintiffs submitted a FOIA request less than a week after the election, and, approximately two months after receiving Plaintiffs' request, GSA identified and produced a set of responsive records. In the meantime, Plaintiffs filed suit. After conferring, Plaintiffs indicated that they objected to each of GSA's Exemption 5 redactions in that production. The parties cross-moved for summary judgment. *See* ECF Nos. 15-19, 22.

On March 4, 2022, the Court denied the parties' cross-motions without prejudice, holding that GSA's "declaration and Vaughn index descriptions [were] not sufficiently specific to assess whether many of the withholdings fall under the deliberative process privilege." Minute Order (March 4, 2022). The Court provided GSA with "an opportunity either to provide a more detailed declaration or Vaughn index alongside a renewed motion for summary judgment, or proceed otherwise in a manner consistent with its obligations under FOIA." *Id.*

Since that ruling, the parties have narrowed the scope of their dispute to twenty-nine redactions in two discrete categories. Once again, GSA invokes the deliberative process privilege, pursuant to FOIA Exemption 5, as the basis for each withholding. Although Plaintiffs continue to challenge GSA's remaining redactions, their objections lack merit. GSA has thoroughly supported each remaining redaction, consistent with applicable legal standards. The first category of documents consists of email deliberations

1

in which GSA staff compiled and analyzed research to help then-GSA Administrator Emily W. Murphy ascertain the President-elect. The second category of documents consists of draft policy documents providing guidance on the transition process to federal agencies, which GSA ultimately disseminated across the government. The drafts contain redline edits and comments throughout, reflecting editorial judgment as to the content of the policies. Both categories of documents are predecisional and deliberative, and thus protected under the deliberative process privilege. GSA also has complied with its obligations to segregate and release non-privileged information, and it has demonstrated concretely and specifically that foreseeable harm would result from the disclosure of the withheld documents.

Accordingly, GSA is entitled to summary judgment.

## BACKGROUND

### I.    GSA's role in possible presidential transitions.

To promote the orderly transfer of Executive power in connection with presidential transitions, Congress passed the Presidential Transition Act of 1963, Pub. L. No. 88-277, 78 Stat. 153 (1964) (codified at 3 U.S.C. § 102 note) ("PTA" or "the Act"). As amended, the Act authorizes the Administrator of General Services to provide necessary services and facilities to the President-elect and Vice President-elect in connection with preparations for the assumption of their official duties (*e.g.*, office space, equipment, etc.) in the event of a change in administration. *See id.* Pursuant to the Act, the terms "President-elect" and "Vice President-elect" mean such persons as are the apparent successful candidates for the offices of President and Vice President, as ascertained by the GSA Administrator following the general election held to determine the electors of President and Vice President. *Id.*

Ascertainment by the Administrator thus triggers GSA's statutory authorization to provide the aforementioned services to the apparent successful candidate in the event of a change in administration. *Id.* But the Act provides no standards or instructions as to the process by which the Administrator should ascertain the apparent successful candidates. *See generally id.*

Separate from the ascertainment determination, pursuant to the Act, the Administrator designates a senior career GSA employee to serve as the Federal Transition Coordinator ("Coordinator") before each presidential election. *Id.* The Coordinator carries out GSA's responsibilities relating to possible transitions. *Id.* In addition to arranging for provision of the services and facilities discussed above, the Coordinator also coordinates transition planning across agencies and ensures that agencies comply with statutory requirements that pertain to transition planning and reporting, among other responsibilities. *See* Declaration of John H. Peters ¶ 26 ("Peters Decl."), attached.

In 2019, Administrator Murphy designated Mary Gibert as the Coordinator for the 2020 presidential election and delegated to Gibert certain authority necessary to carry out the agency's responsibilities in connection with the 2020 presidential election, inaugural activities, and possible transition. *Id.* ¶ 28. Administrator Murphy retained authority, however, for the ultimate ascertainment determination. *Id.* ¶¶ 25, 28.

On November 3, 2020, the 2020 presidential election was held, and on November 23, the GSA Administrator ascertained Biden as the apparent successful candidate. *Id.* ¶¶ 34, 36.

## II.     The relevant FOIA request and procedural background.

On November 9, 2020, Plaintiffs submitted a FOIA request to GSA, seeking four categories of information related to the 2020 presidential election and ascertainment determination. *See* Request 1-2, Compl. Ex. A, ECF No. 1-1. The request's timeframe for responsive information was November 1, 2020, through the date on which the search for responsive records was conducted. *Id.* at 2; Peters Decl. ¶ 39. That search occurred on November 13, 2020, and Plaintiffs have not challenged its adequacy. Peters Decl. ¶¶ 40, 45; ECF No. 15, at 1 ("[T]he agency conducted a reasonable and thorough search that Plaintiffs have said they do not challenge."); *see generally* ECF Nos. 16-1, 17.

In its search, GSA identified five custodians with material responsive to Plaintiffs' request: Emily Murphy, Administrator; Allison Brigati, Deputy Administrator; Robert Borden, Chief of Staff; Trent Benishek, General Counsel; and Mary Gibert, Coordinator. Peters Decl. ¶ 41. From those custodians, GSA identified 744 pages of responsive material. *Id.* ¶ 46. While processing that material for release, the agency communicated with Plaintiffs regarding the production's status. *See, e.g.*, Compl. ¶¶ 11, 13, 14; Compl. Exs. B, C, E, F, G, ECF Nos. 1-2, 1-3, 1-5, 1-6, 1-7; ECF No. 9 ("Answer"), ¶¶ 10, 15. GSA produced all non-exempt information on January 8, 2021, withholding certain information under Exemption 5 (as well as other exemptions that are not at issue). Answer ¶ 16. Specifically, GSA withheld information under the deliberative process privilege, as discussed below and in the attached Declaration and Index. Peters Decl. & Ex. A ("*Vaughn* Index").

In the meantime, Plaintiffs filed this lawsuit on January 5, 2021, asserting claims under FOIA regarding expedited processing and failure to produce records. *See* Compl.

¶¶ 17-24. GSA produced documents three days later. Then, GSA filed its Answer, and the parties conferred regarding several status reports filed in this Court. *See* ECF Nos. 10-13. In June, Plaintiffs' counsel informed prior counsel for Defendant that Plaintiffs would challenge all of the FOIA Exemption 5 redactions—and only those redactions—in the production. Accordingly, the parties proposed and this Court entered a briefing schedule for cross-motions for summary judgment. ECF No. 14; Minute Order (June 28, 2021). GSA subsequently learned that one email previously redacted should have been released. Accordingly, the agency released that email to Plaintiffs on August 2, 2021. *See* Peters Decl. ¶ 48.

Following briefing on cross-motions for summary judgment, *see* ECF Nos. 15-19, 22, the Court denied the parties' cross-motions without prejudice, holding that GSA's "declaration and Vaughn index descriptions [were] not sufficiently specific to assess whether many of the withholdings fall under the deliberative process privilege." Minute Order (March 4, 2022). The Court provided GSA with "an opportunity either to provide a more detailed declaration or Vaughn index alongside a renewed motion for summary judgment, or proceed otherwise in a manner consistent with its obligations under FOIA." *Id.*

Following the Court's ruling, the parties conferred in an effort to narrow the disputed issues in this litigation prior to renewed summary judgment briefing or to resolve their disputes without further judicial action. *See* ECF Nos. 25-28. Consistent with that effort, GSA reconsidered all remaining redactions in May 2022 and November 2022 and, as a matter of discretion, voluntarily released certain predecisional and deliberative communications to Plaintiffs in supplemental productions issued on May 13, 2022, and

November 28, 2022. Peters Decl. ¶ 49. On August 26, 2022, Plaintiffs' counsel informed the undersigned counsel that Plaintiffs intended to challenge the remaining redactions. Accordingly, the parties proposed and this Court entered a briefing schedule for renewed cross-motions for summary judgment. ECF No. 28; Minute Order (Sept. 19, 2022).

## STANDARD OF REVIEW

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Jud. Watch, Inc. v. HUD*, 20 F. Supp. 3d 247, 253 (D.D.C. 2014) (citation omitted); *see also Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011) ("[T]he vast majority of FOIA cases can be resolved on summary judgment."). A court reviews an agency's response to a FOIA request *de novo*. 5 U.S.C. § 552(a)(4)(B). "The defendant in a FOIA case must show that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Light v. DOJ*, 968 F. Supp. 2d 11, 23 (D.D.C. 2013) (citation omitted).

"Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007) (citation omitted).

## ARGUMENT

## I.    GSA properly withheld documents pursuant to FOIA Exemption 5.

FOIA was enacted to serve as a "check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978) (citation omitted). To that end, the Act affords the public access to certain types of government information, while exempting from disclosure documents that could harm "legitimate governmental and private interests . . . ." *FBI v. Abramson*, 456 U.S. 615, 621 (1982). FOIA enumerates nine such exemptions, which must be given "meaningful reach and application" to achieve the balance "between the right of the public to know and the need of the Government to keep information in confidence." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted).

As relevant here, FOIA Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Designed to safeguard confidentiality when "necessary to ensure frank and open discussion and hence efficient governmental operations," Exemption 5 is broad, incorporating all of "the privileges which the government enjoys under the relevant statutory and case law in the pretrial discovery context." *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799, 802 (1984) (emphasis omitted) (quoting *FTC v. Grolier, Inc.* 462 U.S. 19, 26-27 (1983)). Among these privileges are "deliberative process privilege, attorney-client privilege, and attorney work-product privilege." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021) (citation omitted).

The deliberative process privilege is a "long-recognized privilege [designed] to prevent injury to the quality of agency decisions," which protects "all papers which reflect [an] agency's group thinking in the process of working out its policy." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151, 153 (1975) (quoting Kenneth Culp Davis, *The Information Act: A Preliminary Analysis*, 34 U. Chi. L. Rev. 761, 797 (1967)). The privilege ensures that government officials are "free to engage in candid and personal deliberations," *Morley v. CIA*, 699 F. Supp. 2d 244, 255 (D.D.C. 2010) (citation omitted), *vacated in part on other grounds*, 466 Fed. App'x 1 (D.C. Cir. 2012), lest the "fear of later being subject to public ridicule or criticism," *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980), chill "government employees from engaging in frank discussions during the deliberative process," *Morley*, 699 F. Supp. 2d at 256 (citation omitted). Additionally, the deliberative process privilege prevents the "premature disclosure of proposed policies before they have been finally formulated or adopted," *Coastal States*, 617 F.2d at 866, thus "protect[ing] the public from the confusion that would result from premature exposure to discussions occurring before the policies affecting it had actually been settled upon," *Jordan v. DOJ*, 591 F.2d 753, 772-73 (D.C. Cir. 1978) (en banc), *overruled on other grounds by Crooker v. ATF*, 670 F.2d 1051, 1053 (D.C. Cir. 1981) (en banc).

To successfully invoke the deliberative process privilege, the government must demonstrate that the withheld material satisfies two interrelated criteria. *Coastal States*, 617 F.2d at 866. *First*, the material must be predecisional—*i.e.*, it must have been "generated before the adoption of an agency policy." *Id.*; *accord Sierra Club*, 141 S. Ct. at 786. *Second*, it must be deliberative—*i.e.*, it must have been "a direct part of the

deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975); *see also Coastal States*, 617 F.2d at 866 (holding that a document is deliberative if it "reflects the give-and-take of the consultative process.").

These two criteria are closely linked: "To establish that a document is predecisional, the agency need not point to an agency final decision, but merely establish what deliberative process is involved, and the role that the documents at issue played in that process." *Jud. Watch, Inc. v. Export-Import Bank*, 108 F. Supp. 2d 19, 35 (D.D.C. 2000) (citing *Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1123 (D.C. Cir. 1989)); *see also Sierra Club*, 141 S. Ct. at 786 ("[A] document cannot be deliberative unless it is predecisional."). "A predecisional document is a part of the 'deliberative process[]' if 'the disclosure of [the] materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.'" *Formaldehyde Inst.*, 889 F.2d at 1122 (emphasis omitted) (quoting *Dudman Commc'ns Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987)). As the Supreme Court has explained, "[a]gencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process." *Sears*, 421 U.S. at 151 n.18.

A range of materials may qualify as predecisional and deliberative, including "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the

agency." *Coastal States*, 617 F.2d at 866.  Courts have rejected arguments that such communications must occur through formal channels, instead recognizing that, in the modern era, agency deliberations often occur via email and through other similar informal mediums. *See, e.g.*, *Ctr. for Biological Diversity v. EPA*, 369 F. Supp. 3d 128, 135 (D.D.C. 2019) (applying the deliberative process privilege to material in email chains); *Pub. Citizen, Inc. v. U.S. Dep't of Educ.*, 388 F. Supp. 3d 29, 42 (D.D.C. 2019) (same). Importantly, the deliberative process privilege "protects not only communications which are themselves deliberative in nature, but all communications which, if revealed, would expose to public view the deliberative process of an agency." *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (citation omitted).

To establish that a document is predecisional and deliberative, an agency "must show (1) 'what deliberative process is involved,' and (2) 'the role played by the documents in issue in the course of that process,'" and "should also explain (3) the 'nature of the decisionmaking authority vested in the officer or person issuing the disputed document,' and (4) the "relative positions in the agency's chain of command occupied by the document's author and recipient." *Jud. Watch, Inc. v. DOJ*, 20 F.4th 49, 55 (D.C. Cir. 2021) (quoting *Senate of the Commonwealth of Puerto Rico on Behalf of Judiciary Comm. v. DOJ*, 823 F.2d 574, 585-86 (D.C. Cir. 1987)).  Stated differently, the agency must explain "the 'who, what, where, and how' of internal governmental deliberations" to with the withheld material pertains, *Campaign Legal Ctr. v. DOJ*, 34 F.4th 14, 23 (D.C. Cir. 2022) (quoting *Jud. Watch, Inc.*, 20 F.4th at 57), and "the role played by the withheld material" in that deliberative process," *Jud. Watch, Inc.*, 20 F.4th at 57.

The documents GSA withheld here are all predecisional and deliberative. As explained in the Peters Declaration, the withheld documents fall into two categories: (1) "emails that detail research completed by GSA employees on topics related to the Administrator's ascertainment determination" (*Vaughn* Index Nos. 1-13), and (2) "draft versions" of a policy document entitled "Instructions for Agency Transition Directors and Agency Points of Contact" and of a flowchart describing the onboarding process for the Biden-Harris Transition Team's agency review teams in the event of a change in administration (*Vaughn* Index Nos. 14-29). *See* Peters Decl. ¶¶ 29-33, 50, 62.

### A. GSA properly withheld deliberative email communications under the deliberative process privilege and Exemption 5.

The first category consists of deliberative email communications between GSA employees, including Rob Borden, GSA's Chief of Staff; Elizabeth Cain, Director of GSA's Presidential Transition Support Team; Mary Gibert, GSA's Federal Transition Coordinator; Pamela Pennington, Press Secretary and Deputy Associate Administrator for Media Affairs, GSA's Office of Strategic Communication; Jeffrey Post, Associate Administrator, GSA's Office of Congressional and Intergovernmental Affairs; and Isadora Yoffie, Deputy, GSA's Presidential Transition Support Team. *See id.* ¶¶ 58-61; *Vaughn* Index Nos. 1-13. Gibert played a statutorily designated role in the transition process and held authority designated to her by the Administrator. *See* Peters Decl. ¶¶ 26, 28. Meanwhile, Borden served in a "senior agency staff" role, while Cain and Yoffie served on GSA's Presidential Transition Support team. *See id.* ¶ 27. In these capacities, Gibert, Cain, and Yoffie "routinely advise[d] and support[ed] the Administrator throughout the transition process, including by gathering information [to] help the Administrator make the ascertainment determination." *Id.* The above-cited portions of GSA's Peters Declaration

and attached *Vaughn* index establish "the 'who'" of the relevant deliberative process, "*i.e.*, the roles of the document drafters and recipients and their places in the chain of command." *Jud. Watch, Inc.*, 20 F.4th at 56.

Each redaction in this category pertains to research findings on a topic related to the Administrator's ascertainment decision, namely, "the timing of ascertainment relative to other post-election events in previous presidential transitions." *Vaughn* Index Nos. 1-13; Peters Decl. ¶ 58. More specifically, the redactions consist of Gibert's summary of research findings on that topic; Borden and Yoffie's assessments of research findings on that topic; Borden, Post, and Yoffie's requests for additional information regarding existing research on that topic; and Borden and Yoffie's requests for additional research to be conducted on that topic. *See Vaughn* Index Nos. 1-13. In at least one instance, the Administrator herself made the request for additional research, which she communicated through Borden. *See Vaughn* Index No. 6. The above-cited portions of GSA's Peters Declaration and attached *Vaughn* index establish "the 'what'" of the relevant deliberative process, "*i.e.*, the nature of the withheld content." *Jud. Watch, Inc.*, 20 F.4th at 56.

The relevant email communications were sent between November 9, 2020, and November 12, 2020, in the period between the election and ascertainment. *See Vaughn* Index Nos. 1-13. The Administrator relied on this research to facilitate her ascertainment determination, particularly in the absence of precise statutory guidelines. More specifically, "[i]n almost every instance, the Administrator has made the ascertainment determination the day after the presidential election, following concession by one candidate." Peters Decl. ¶ 19. In 2020, absent a concession immediately following the election, Administrator Murphy "looked to precedent from prior elections involving legal

challenges and incomplete counts." *Id.* ¶ 37 (quoting Letter from Emily W. Murphy, Administrator, U.S. General Services Administration, to the Honorable Joseph R. Biden, Jr. (Nov. 23, 2020), https://www.gsa.gov/cdnstatic/2020-11-23_Hon_Murphy_to_Hon_Biden_0.pdf ("Ascertainment Letter")). The Administrator relied on her subordinates to compile and analyze this precedent, and the redactions in the first category pertain to that research. *See* Peters Decl. ¶ 58. The above-cited portions of GSA's Peters Declaration and attached *Vaughn* index establish "the 'where'" and "the 'how'" of the relevant deliberative process, "*i.e.*, the stage within the broader deliberative process in which the withheld material operates" and "the way in which the withheld material facilitated agency deliberation," respectively. *Jud. Watch, Inc.*, 20 F.4th at 56.

The redactions in this category are predecisional in that they were "generated before the agency's final decision on the matter"—namely, the Administrator's ascertainment of the 2020 President-elect for purposes of the transition services that GSA provides in the event of a change in administration, pursuant to the PTA. *Sierra Club, Inc.*, 141 S. Ct. at 786; *see also Citizens for Resp. & Ethics in Washington v. DOJ*, 45 F.4th 963, 972 (D.C. Cir. 2022) ("*CREW*") ("Assessing whether a record is pre-decisional or deliberative necessarily requires identifying the decision (and the associated decisional process) to which the record pertains."). The Administrator made that determination by letter issued on November 23, 2020. *See* Ascertainment Letter. As noted, the email communications that contain the redactions within this category were sent between November 9, 2020, and November 12, 2020. *See Vaughn* Index Nos. 1-13. Because the research findings at issue were "prepared in order to assist [the Administrator] in arriving at [her] decision, rather than to support a decision already made," they are predecisional. *CREW*, 45 F.4th at 972

13

(quoting *Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992)).

The redactions in this category are also deliberative, in that revealing the research underlying the Administrator's ascertainment determination would "inevitably reveal the government's deliberations" with respect to that decision. *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 366 (D.C. Cir. 2021) (quoting *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 876 (D.C. Cir. 2010)). Although the distinction between fact and opinion may serve as "a 'rough guide' for sifting out non-deliberative factual content from deliberative policy judgments," *id.* at 365 (quoting *Access Reps. v. DOJ*, 926 F.2d 1192, 1195 (D.C. Cir. 1991))—*i.e.*, factual content is less often deliberative than opinion content—"the legitimacy of withholding does not turn on whether the material is purely factual in nature or whether it is already in the public domain, but rather on whether the selection or organization of facts is part of an agency's deliberative process," *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (citing *Montrose Chem. Corp. of Cal. v. Train*, 491 F.2d 63, 71 (D.C. Cir. 1974)).

Accordingly, "factual material [that] was assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action" is "properly withheld" pursuant to the deliberative process privilege. *Mapother v. DOJ*, 3 F.3d 1533, 1539 (D.C. Cir. 1993). Indeed, the D.C. Circuit has analogized the role that agency subordinates play under such circumstances to the task that "judicial clerks perform in connection with many of the cases [that courts] decide," *id.*, namely, "to sift through the report of a special master or other lengthy materials in the record" to "determine what materials will be significant in reaching

a proper decision," *Montrose Chem. Corp.*, 491 F.2d at 68. Just as, in the judicial context, "[t]o probe [a law clerk's] summaries of record evidence would be the same as probing the decision-making process itself," so, too, Plaintiffs here "may not probe [the] deliberative process" of GSA's transition staff in an effort to determine "[w]hether [the Administrator] weighed the correct factors" and "whether [her] judgmental scales were finely adjusted and delicately operated" in making the ascertainment determination. *Id.*

In sum, GSA properly invoked the deliberative process privilege to withhold email communications relating to the research that the Administrator's subordinates compiled "concern[ing] the timing of the ascertainment determination relative to other post-election events in previous presidential transitions," on which the Administrator relied ascertainment determination absent precise statutory guidelines. Peters Decl. ¶ 56; *Vaughn* Index Nos. 1-13.

### B. GSA properly withheld deliberative draft policy documents pursuant to the deliberative process privilege and Exemption 5.

The second category of withholdings consists of draft versions of: (1) instructions that detail how agencies should engage with the Biden-Harris Transition Team's agency review teams ("ARTs") in the event of a change in administration ("Instructions"), and (2) a corresponding flowchart describing the ART onboarding process. *See* Peters Decl. ¶¶ 29-33, 62-65; *Vaughn* Index Nos. 14-29; *see also* Peters Decl. ¶ 24 (describing the role of ARTs in the transition process).

With respect to "the 'where'" of the relevant deliberative process, *Jud. Watch, Inc.*, 20 F.4th at 56, "*i.e.*, the stage within the broader deliberative process in which the withheld material operates," the final Instructions were issued in connection with OMB Memorandum M-20-33, issued on September 4, 2020, and a memorandum of

understanding ("MOU") issued on September 30, 2020, which collectively established certain transition procedures between the White House and the Biden-Harris Transition Team in the event of a change in administration. *See* Peters Decl. ¶¶ 29-30. In turn, GSA issued the Instructions and corresponding flowchart to "direct federal agencies how to implement the September 30, 2020 MOU, including how to engage with the Biden-Harris Transition Team's ARTs in the event of a change in administration." *Id.* ¶ 31. The final versions of both documents, which were issued on October 29, 2020, are attached to this filing. *See id.* ¶¶ 33, 65; Peters Decl., Ex. B, at 149-51.

With respect to "the 'who'" and "the 'how'" of the relevant deliberative process, "*i.e.*, the roles of the document drafters and recipients and their places in the chain of command" and "the way in which the withheld material facilitated agency deliberation," respectively, *Jud. Watch, Inc.*, 20 F.4th at 56, GSA "went through several iterations" of the draft Instructions and flowchart in October 2020, in an effort to finalize both documents, Peters Decl. ¶¶ 31-32. "Individuals from the White House Counsel's Office, the Office of Management and Budget ["OMB"], and GSA's Presidential Transition Support Team review[ed] the guidance and ma[de] editorial judgments throughout—including redline edits, comments in the margins, highlights, and placeholders." *Id.* ¶¶ 31-32. GSA issued final versions of the Instructions and corresponding flowchart to "transition directors across the federal government." *Id.* ¶¶ 33. The Instructions were issued in a memorandum from Gibert, with the heading "Instructions for Agency Transition Directors and Agency Points of Contact." Peters Decl., Ex. B at 149 (capitalization altered).

With respect to "the 'what' of the relevant deliberative process, *Jud. Watch, Inc.*, 20 F.4th at 56, GSA is withholding draft versions of both the instructions and the flowchart,

which "contain editorial judgments throughout, including redline edits, comments in the margins, highlighted text, and placeholders to add additional information." Peters Decl. ¶ 64. "Those annotations represent the personal opinions of each editor, which were considered, discussed, and resolved in order to create GSA's ultimate policy decision—the final versions of the documents that were released on October 29, 2020." *Id.* The drafts were attached to email communications exchanged from October 19, 2020, to October 29, 2022, between Gibert; Yoffie; Eric Hamilton, Deputy Associate Counsel to the President; Peter Warren, Associate Director, OMB; and a member of the Biden-Harris Transition Team. *See Vaughn* Index Nos. 14-29. The email communications have been released in full to Plaintiffs, save for redactions that Plaintiffs do not challenge. *See* Peters Decl., Ex. B at 18-143; Peters Decl. ¶ 49.

GSA has properly withheld these draft policy documents, which are protected under the deliberative process privilege. Indeed, "[p]roposed drafts of a non-final agency decision that are still undergoing review, debate, and editing are the type of deliberative work in progress that falls at the core of the deliberative process privilege." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 364 (citing *Fish & Wildlife Serv.*, 141 S. Ct. at 786). The drafts at issue here are predecisional in that they were produced and circulated before the issuance of the final versions. *See* Peters Decl. ¶ 63. And they are deliberative in that GSA, in consultation with other government officials, continued to deliberate over their content—indeed, that was the very purpose of the drafts. *See id.* ¶ 64. Stated differently, in drafting the instructions and flowchart, GSA "was not simply describing an already-made agency decision." *Campaign Legal Ctr.*, 34 F.4th at 25. "Instead, it was engaged in formulating and refining both the actual content of . . . a new and consequential

governmental policy." *Id.*; *see also* Peters Decl. ¶ 72 (noting that "logistics are paramount when it comes to any transition"). Thus, regardless of whether "any portions of these drafts that were incorporated into the final" policy documents, the drafts retain their predecisional and deliberative status. *Reps. Comm. for Freedom of the Press*, 3 F.4th at 365.

Moreover, and as noted, the withheld drafts contained "redline edits, comments in the margins, highlighted text, and placeholders to add additional information." Peters Decl. ¶ 64. Courts have recognized that such drafting annotations are powerful evidence of a document's predecisional and deliberative nature.[1] Indeed, "such redlines and comments

---

[1] *See, e.g.*, *Lewis v. United States Dep't of Treasury*, 851 F. App'x 214, 217 (D.C. Cir. 2021) (holding that an agency properly withheld under Exemption 5 "drafts of a document eventually published in the Federal Register, containing redline edits and comments conveying the authors' opinions regarding the draft language") *100Reporters v. U.S. Dep't of State*, No. CV 19-1753 (RDM), 2022 WL 1223709, at *12 (D.D.C. Apr. 26, 2022) (same, as to a "draft letter 'contain[ing] edits in redline and comment bubbles,' where "the comments reflect the 'drafter's preliminary, unclear thoughts about what information should be included in the letter'" (internal quotation marks and citation omitted)); *Reps. Comm. for Freedom of the Press v. CBP*, 567 F. Supp. 3d 97, 120 (D.D.C. 2021) (same, as to "drafts [that] include[d] contextual recommendations, comments, and redline edits made by individuals from various [agency] offices that convey the authors' opinions regarding the draft language" (internal quotation marks and citation omitted)), *appeal dismissed*, No. 21-5293, 2022 WL 801357 (D.C. Cir. Mar. 15, 2022); *Jud. Watch, Inc. v. U.S. Dep't of State*, No. CV 15-687 (JEB), 2021 WL 3363423, at *6 (D.D.C. Aug. 3, 2021) (same, as to a collection of draft documents that "were often accompanied by redline edits" (internal quotation marks and citation omitted)); *Nat'l Immigr. Project of Nat'l Laws. Guild v. ICE*, No. 17-CV-02448 (APM), 2020 WL 5798429, at *3 (D.D.C. Sept. 29, 2020) (same, as to a "draft reflect[ing] editorial judgments, including redline edits and comments in the margins" (internal quotation marks and citation omitted)); *Judge Rotenberg Educ. Ctr., Inc. v. FDA*, 376 F. Supp. 3d 47, 70 (D.D.C. 2019) (same, as to a "redline draft contain[ing] editorial comments of agency staff to be considered before the document was finalized" (internal quotation marks and citation omitted)); *Taylor Energy Co. LLC v. U.S. Dep't of Interior Bureau of Ocean Energy Mgmt.*, 271 F. Supp. 3d 73, 95 (D.D.C. 2017) (same, as to a draft memorandum "with comments and redline edits" (internal quotation marks and citation omitted)); *James Madison Project v. DOJ*, 208 F. Supp. 3d 265, 290-91 (D.D.C. 2016) (same, as to "*draft* versions of various memoranda, letters, charts and other documents *which contain comments, or tracked changes,* made in connection with inter

are significant" for at least two reasons. *Pub. Emps. for Env't Resp. v. EPA*, No. 18-CV-2219 (BAH), 2021 WL 2515007, at \*9 (D.D.C. June 18, 2021). *First*, with respect to the predecisional prong of the standard, such annotations "corroborate the 'administrative context' in which the [draft document] is situated, highlighting that [the agency] treated [it] as a work in progress, not a final statement of agency policy." *Id.* (citation omitted) (quoting *Sierra Club*, 141 S. Ct. at 786). *Second*, with respect to deliberativeness, the "markings themselves comprise part of [the agency's] deliberative process, reflecting [agency] staff's tentative ideas, proposals, and recommendations on the substance of the [relevant policy], and plainly 'reflect the personal opinions of the writer rather than the policy of the agency.'" *Id.* (quoting *Coastal States*, 617 F.2d at 866).

In sum, "actively edited drafts of an unfinished, work-in-progress policy letter," such as the instructions and flowchart at issue here, fall squarely under the deliberative process privilege. *Campaign Legal Ctr.*, 34 F.4th at 27. The annotations throughout the drafts further underscores their predecisional and deliberative nature. Accordingly, GSA properly withheld these drafts pursuant to Exemption 5.

### C. The draft document that GSA disclosed to a member of the Biden-Harris Transition Team is protected under the deliberative process privilege.

As noted, one of the withheld draft policy documents was sent by email from Gibert to a member of the Biden-Harris Transition Team. *See Vaughn* Index No. 21. More specifically, Gibert sent the "draft Guidance documents" to that recipient "concurrently with circulation to OMB; asked the Transition Team staff member to "[l]et [GSA] know"

---

and intra-agency *pre-decisional* discussions" (emphasis in original) (internal quotation marks and citation omitted)).

if the recipient "s[aw] any concerns"; and noted that GSA would be meeting with the Transition Team later that day "on the survey and the process in general." Peters Decl., Ex. B, at 83.

Exemption 5 requires that all withheld communications are "inter-agency" and "intra-agency" communications. 5 U.S.C. § 552(b)(5). Further, FOIA defines "agency" as "each authority of the Government of the United States," excluding Congress, the Courts of the United States, territorial governments, and the D.C. government, *id*. § 551(1), and including, for purposes of Exemption 5, "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency," *id*. 5 U.S.C. § 552(f).

As the D.C. Circuit has held, "a document need not be created by an agency or remain in the possession of the agency in order to qualify as 'intra-agency.'" *Jud. Watch, Inc. v. DOE*, 412 F.3d 125, 130 (D.C. Cir. 2005). Instead, "what matters is whether a document will expose the pre-decisional and deliberative processes of the Executive Branch." *Id.* at 131.

Thus, for example, the D.C. Circuit held that responses to a questionnaire that the Attorney General sent to all Senators regarding their procedures for selecting and recommending potential judicial nominees was "exempt from FOIA disclosure under Exemption 5, except for factual segments which do not reveal the deliberative process and are not intertwined with the policy-making process." *Ryan v. DOJ*, 617 F.2d 781, 784, 791 (D.C. Cir. 1980). The Attorney General sent the questionnaire to implement Executive Order 12,097. *Id.* at 784. As noted above, Congress is expressly excluded from FOIA's

definition of an "agency." 5 U.S.C. § 552(b). Nevertheless, the D.C. Circuit held that the questionnaire responses (and, *a fortiori*, the questionnaire itself) were privileged, noting that the completed questionnaires "were generated by an initiative from the Department of Justice, *i.e.*, the questionnaire sent out by the Department to the Senators." *Ryan*, 617 F.2d at 790. The court also reasoned that, "[i]n the course of its day-to-day activities, an agency often needs to rely on the opinions and recommendations of temporary consultants, as well as its own employees." *Id.* at 789. "Such consultations," it continued, "are an integral part of its deliberative process; to conduct this process in public view would inhibit frank discussion of policy matters and likely impair the quality of decisions." *Id.* at 789-90.

It follows from the D.C. Circuit's decision in *Ryan* that the draft policy document that Gibert sent to a Biden-Harris Transition Team staff member is protected under the deliberative process privilege. GSA solicited feedback (*i.e.*, "concerns") from the staff member on the policy documents that GSA prepared in connection with OMB Memorandum M-20-33, through a collaborative process between the White House Counsel's Office, OMB, and GSA's Presidential Transition Support Team. Peters Decl., Ex. B, at 83; Peters Decl. ¶¶ 31-32. This solicitation was closely analogous to the questionnaire that the Attorney General sent to Senators to implement an executive order in *Ryan*. Thus, under *Ryan*, even any feedback that the Biden-Harris Transition Team may have sent on the draft—analogous to the Senators' questionnaire responses—would have been privileged. It follows that the draft itself necessarily is privileged.

Moreover, and in any event, a presidential transition team is a quasi-governmental entity in its own right. The PTA provides transition teams with Federal funds; access to classified information; and access to certain government equipment, office space, and other

Federal facilities. *See* PTA §§ 3(a)-(b), 4(g)(l); *see also* Exec. Order No. 13,727, 81 Fed. Reg. 29,465 (May 6, 2016). Under the Act, Federal funds may be used "during the transition" to prepare materials for "key prospective Presidential appointees," and to provide the President-elect, "as soon as possible after [election day]," (*i.e.*, before inauguration) with a "detailed classified, compartmentalized summary . . . of specific operational threats to national security; major military or covert operations; and pending decisions on possible uses of military force." PTA § 3(a)(8)(A)(i), (v). The Act also enables transition teams to begin the process of selecting, vetting, and nominating potential Executive Branch officials. *See* PTA § 3(f)(1).

Alternatively, communications between GSA and presidential transition teams in the service of GSA's statutory transition-related responsibilities fall under the consultant-corollary doctrine. This doctrine provides that even documents that *originate* outside the Executive Branch may be deemed intra-agency for purposes of the deliberative process privilege when they are "created for the purpose of aiding the agency's deliberative process." *Dow Jones & Co. v. DOJ*, 917 F.2d 571, 575 (D.C. Cir. 1990) (emphasis added). Applying this doctrine, courts have extended protection to communications between Government agencies and outside actors and experts, such as former Presidents, *Pub. Citizen, Inc. v. DOJ*, 111 F.3d 168, 170 (D.C. Cir. 1997); private contractors for the Government, *Elec. Priv. Info. Ctr. v. DHS*, 892 F. Supp. 2d 28, 45 (D.D.C. 2012); and presidentially created commissions, *Jud. Watch, Inc.*, 412 F.3d at 130-31.

Indeed, this Court has considered whether an agency's responses to a questionnaire produced *by* a presidential transition team fall within that corollary—the inverse of the communication at issue here, in which GSA sent draft policy documents produced by the

government to a Biden-Harris Transition Team staff member. *See Protect Democracy Project, Inc. v. DOE*, 330 F. Supp. 3d 515, 519 (D.D.C. 2018). Although it had no occasion to rule on the issue, the Court recognized that, even "assuming that the transition team is not in fact an 'agency' under FOIA," it does not necessarily "follow[] that documents shared between [an agency] and [a presidential] transition team fall outside Exemption 5." *Id.* at 527 (citing *Jud. Watch, Inc.*, 412 F.3d at 129-31; *Pub. Citizen, Inc.*, 111 F.3d at 169-70). Indeed, protecting deliberative communications with presidential transition teams is necessary to protect the interests at the heart of FOIA Exemption 5. Transition teams are assembled before a presidential election to provide the candidate with advice and information necessary in order to ensure an orderly transfer of executive power in the event that he or she becomes President-elect. Federal agencies' communications with such transition teams in service of the agencies' own statutory obligations therefore strike at the core of the privilege.

For all of these reasons, the draft that Gibert sent to a Biden-Harris Transition Team staff member falls within the consultant-corollary doctrine, and is protected under the deliberative process privilege prong of Exemption 5.

II.    **GSA has complied with the FOIA Improvement Act's requirements that it: segregate and disclose non-privileged information and demonstrate that foreseeable harm will result from disclosure of any withheld documents.**

The FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538 (2016), added and clarified several key provisions of the FOIA. As relevant here, the statute instructs agencies to "consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible" and "take reasonable steps necessary to segregate and release nonexempt information . . . ." FOIA Improvement Act, § 2 (codified at 5 U.S.C. § 552(a)(8)(A)(ii)). Additionally, the

statute provides that an agency may only invoke a FOIA exemption if it "reasonably foresees that disclosure would harm an interest protected by an exemption" or if "disclosure is prohibited by law." *Id.* (codified at 5 U.S.C. § 552(a)(8)(A)(i)). GSA has complied with both of these requirements.

### A. GSA segregated and disclosed all non-privileged material within the requested documents.

When invoking the deliberative process privilege, an agency must segregate and disclose any non-privileged material, including information that is "purely factual," unless it is "so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (citation omitted). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) (citation omitted). And a reviewing court "may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated." *Juarez v. DOJ*, 518 F.3d 54, 61 (D.C. Cir. 2008) (citation omitted).

In reviewing and preparing the requested documents, GSA segregated and disclosed all non-privileged information. It satisfied its obligations by "conduct[ing] a page-by-page and line-by-line review of the documents at issue" and determining that "the documents do not contain any reasonably segregable, nonexempt information beyond that already disclosed by GSA." Peters Decl. ¶ 75; *see Porup v. CIA*, 997 F.3d 1224, 1239 (D.C. Cir. 2021) (holding that an agency "ha[d] carried its burden in demonstrating that it released all segregable portions of the responsive documents" where its declarant "attested that the [a]gency had conducted a page-by-page and line-by-line review, and released all

reasonably segregable, non-exempt information within responsive records" (internal quotation marks and citation omitted)); *accord Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020)).

Review of the documents containing the disputed redactions bolsters this conclusion. With respect to the deliberative email communications, GSA redacted only particular lines of the relevant emails. *See* Peters Decl., Ex. B, at 1-17. With respect to the draft policy documents, GSA redacted the entirety of the draft documents themselves, although it released the email threads to which the documents were attached (subject to redactions not at issue here). *See* Peters Decl., Ex. B, at 18-143. GSA determined that full redaction of the drafts is necessary to protect the deliberative process because each draft document either: "(1) contain[s] redline edits in every paragraph, such that no paragraph can be released without divulging information protected by the deliberative process privilege," or "(2) [is] largely without redline edits (but [does] contain comments in the margins and placeholders for certain information), but each portion is substantially different from the final version of the document, such that no singular portion can be released without divulging information protected by the deliberative process privilege." Peters Decl. ¶ 76. Moreover, even to the extent that portions of the drafts remained unchanged in their final versions, "[p]eeking behind that to discern what portions of drafts were and were not incorporated would reveal the very deliberative process that the privilege protects." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 365 (citing *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1049 (D.C. Cir. 1982)).

In sum, GSA has satisfied its burden to segregate and disclose all non-privileged material within the relevant documents.

**B.  GSA has demonstrated that it would suffer foreseeable harm if ordered to disclose any of the withheld materials.**

As noted, and as relevant here, an agency invoking Exemption 5 must establish that it "reasonably foresees that disclosure would harm an interest protected by [that] exemption."  FOIA Improvement Act § 2.  Satisfying this requirement requires a "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward."  *Reps. Comm. for Freedom of the Press*, 3 F.4th at 370; *see also id.* at 369-70 ("In the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations" (quoting *Machado Amadis*, 971 F.3d at  371).  Although an agency may not rely on "boilerplate and generic assertions that release of *any* deliberative material would necessarily chill internal discussions" or simply "mouth[] the generic rationale for the deliberative process privilege itself," it may proceed "a category-by-category basis rather than a document-by-document basis"—provided that the agency "independently demonstrate[s]" the "basis and likelihood" of harm for each category.  *Id.* at 369-70 (emphasis added).  "Naturally, this inquiry is context specific."  *Id.* at 370 (citing *Rosenberg v. Dep't of Def.*, 442 F. Supp. 3d 240, 259 (D.D.C. 2020); *Ctr. for Investigative Reporting v. CBP*, 436 F. Supp. 3d 90, 104 (D.D.C. 2019); *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 79 (D.D.C. 2018)); *see also id.* at 372 (holding that "[t]he very context and purpose" of withheld documents "ma[de] the foreseeability of harm manifest" (citation omitted))

GSA has concretely and specifically demonstrated that disclosure of the predecisional, deliberative documents at issue here would cause foreseeable harm to the interests that the deliberative process privilege is designed to protect. With respect to the deliberative email communications, GSA has explained that "disclosure would stifle the quality and candor of advice that the Administrator's subordinates provide in the context of a presidential election that is not immediately followed by a candidate's concession." Peters Decl. ¶ 67. Such chilling would impede "the ability of GSA's leaders to seek and receive high-quality, candid advice surrounding a sensitive and vital government process," and, in turn, would "undermine GSA's ability to carry out its statutory transition-related responsibilities." *Id.* ¶¶ 67-68.

With respect to the draft policy documents, disclosure "would undermine GSA's ability to freely exchange and improve upon material in the course of developing final documents and decisions." *Id.* ¶ 71. That is because "GSA employees and others across the federal government tend to hold back from sharing important observations, analyses, and recommendations if they fear that such deliberations will be made public." *Id.* Disclosure "would also cause public confusion (or even confusion of other agencies) by releasing information that does not reflect the final views or policies of GSA" with respect to government-wide transition procedures. *Id.* ¶ 72. Each of these harms—the stifling of candid editorial feedback on draft policy documents and potential confusion from the release of non-final policies—would undermine "GSA's ability to coordinate transition planning across agencies and . . . the development of an adequate, thorough, thoughtful, and sound assessment of how agencies should engage with ARTs in the event of a change in administration in any particular election cycle—a key aspect of a successful transition."

*Id.* ¶ 71. In sum, as to both categories of withholdings, GSA has provided "a focused and concrete demonstration" of the harms that would result from disclosure of these particular documents. *Reps. Comm. for Freedom of the Press*, 3 F.4th at 370.

Further, courts have recognized that the likelihood and magnitude of foreseeable harm are often heightened where the context of the agency decision at issue is particularly "high-profile and sensitive." *Jud. Watch, Inc. v. U.S. Dep't of State*, 557 F. Supp. 3d 52, 62 (D.D.C. 2021) (first citing *Leopold v. DOJ*, No. CV 19-2796 (JEB), 2021 WL 3128866, at *4 (D.D.C. July 23, 2021); and then citing *Reps. Comm. for Freedom of the Press*, 3 F.4th at 366); *see also id.* at 64 ("[D]isclosure of such internal deliberations on this sensitive and controversial subject would cause foreseeable harm to similar deliberative processes going forward."). Here, several GSA employees—both political appointees and career civil servants—who were involved in transition planning have faced email and phone harassment and harassment of their families, while the Administrator "received an overwhelming number of threats (including threats of physical violence)" during the period of time between the election and ascertainment. Peters Decl. ¶ 69. As a result, career employees who have previously supported GSA's transition efforts have expressed hesitancy to support the next transition. *Id.* In this context, withholding both categories of documents is necessary to "ensure that public servants can feel confident and safe in carrying out ascertainment-related duties in the future," and, conversely, disclosure "would further discourage career staff from volunteering to support GSA's transition-related efforts" and thereby undermine the continuity of our government. *Id.* ¶¶ 69-70, 73.

## **CONCLUSION**

For the foregoing reasons, the Court should grant GSA's motion for summary

judgment and enter final judgment in favor of GSA.


Dated:  December 1, 2022                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Acting Assistant Attorney General

                                            ELIZABETH J. SHAPIRO
                                            Deputy Director

                                            /s/ *Taisa M. Goodnature*
                                            Taisa M. Goodnature
                                            N.Y. Bar No. 5859137
                                            Trial Attorney
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street, NW
                                            Washington, DC 20005
                                            Phone: (202) 514-3786
                                            Email: Taisa.M.Goodnature@usdoj.gov

                                            *Counsel for Defendant*